UNITED STATES, Appellee,

v.

Michael FISHER, Defendant, Appellant.

Nos. 92–2380 and 91–1330.

United States Court of Appeals,
First Circuit.

Heard March 3, 1993.

Decided Aug. 17, 1993.

Anthony M. Traini, Providence, RI, for defendant, appellant.

A. Clayton Spencer, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., Boston, MA, was on brief, for appellee.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this appeal, defendant-appellant Michael Fisher challenges his convictions for attempting and conspiring to possess with intent to

distribute cocaine in violation of 21 U.S.C. § 846.[1] After careful consideration of defendant's arguments, we affirm.

## I.

### BACKGROUND

In mid–1989, the United States Drug Enforcement Agency ("DEA"), initiated a "reverse sting" in which it planned to sell narcotics to Ali Osseiran, a known narcotics trafficker. In June 1989, Joseph Khoury, a paid DEA informant, met with Osseiran at his place of business, Absolute Diamonds in Boston. At that time, Osseiran expressed interest in participating in a large drug transaction. Khoury then introduced Osseiran to Aziz Malik, another DEA informant, whom Khoury portrayed as a significant drug dealer.

On October 31, 1989, Malik offered to involve Osseiran in a future heroin transaction on the condition that Osseiran provide one million dollars in financing. Shortly thereafter, on November 3, 1989, Osseiran told Malik that he was interested in purchasing 25 kilograms of heroin and that he already had two buyers interested in five kilograms of heroin each. He also told Malik that his buyers would require a sample of the heroin. At one point, Osseiran accidentally let slip that a sample would be going to a person named "Mike" in East Boston.

On November 20, 1989, in accordance with Osseiran's instructions, Malik delivered to Rashid Haloui, Osseiran's employee, a two-gram sample of heroin, which was divided in half. Haloui, in accordance with Osseiran's instructions, then drove to East Boston and delivered one portion of the sample to defendant Michael Fisher. Later that evening, Malik called Osseiran to see if the buyers had approved of the samples. Osseiran told him that the buyers liked the samples and that the money would be forthcoming.

In the ensuing weeks, Malik and Osseiran had several meetings during which they discussed arrangements for the delivery of the entire amount of heroin. Contemporaneously, Osseiran informed Malik that he was having difficulty obtaining the up-front money. He also advised Malik that if the drugs were cocaine rather than heroin, he could put the deal together more easily. Osseiran reiterated that he had two buyers for five kilograms of heroin each, but that he was not sure what to do with the rest of the drugs.

During a meeting in mid-December, Malik agreed to exchange ten kilograms of the previously agreed upon heroin for seventy kilograms of cocaine. Because the original twenty-five kilogram deal had been subsequently reduced to twenty kilograms, a total of ten kilograms of heroin and seventy kilograms of cocaine were now to be delivered to Osseiran.

On December 26, Osseiran informed Malik that he was prepared to consummate the deal. It was agreed that the delivery would be concluded within the next couple of days. On December 28, Osseiran and Malik made arrangements for the delivery to take place the next day.

On the morning of December 29, Fisher visited Absolute Diamonds and conferred with Osseiran for a short time. Later that afternoon, Malik met with Osseiran at Absolute Diamonds, and received from him a shopping bag containing money and what appeared to be diamonds.[2] While at the store, Malik made a phone call ordering the delivery of the drugs.

As instructed by Osseiran, Haloui went to the Logan Airport Hilton to make the pickup. At Logan, Malik's courier, who actually was another DEA informant, Tauquir Islam, gave Haloui a bag purporting to contain 15

---

1. 21 U.S.C. § 846 provides:

 Any person who attempts or conspires to commit any [controlled substance] offense ... shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. The parties had previously agreed that because Osseiran had not been able to raise the full amount of money agreed upon, diamonds from the jewelry store would act as collateral until full payment was made. As it turned out, the stones in the shopping bag were imitation gems made from cubic zirconia.

kilos of cocaine.[3] Immediately thereafter, Haloui was arrested. At or around the same time, Osseiran was arrested at Absolute Diamonds.

After his arrest, Haloui told the DEA agents that Osseiran had instructed him to deliver the bag to Fisher at Fisher's liquor store in East Boston. Haloui agreed to assist the government by participating in a controlled delivery of the drugs to Fisher. Haloui and Islam then went to Fisher's store. When they arrived, Fisher met them outside the store and refused delivery of the drugs.[4] Fisher then motioned Haloui inside the store and privately told Haloui that he was aware that Osseiran had been arrested and that Islam was a "cop." Fisher was arrested on the evening of December 29, 1989.

On January 26, 1990, Fisher, Osseiran, and Haloui were charged in a four count indictment. Counts I and II charged Osseiran and Haloui with attempt (Count I) and conspiracy (Count II) to possess with intent to distribute more than five kilograms of cocaine and more than one kilogram of heroin. Counts III and IV charged Fisher with attempt (Count III) and conspiracy (Count IV) to possess with intent to distribute more than five kilograms of cocaine.

Due to his post-arrest confessions and the constitutional concerns raised thereby, Haloui was tried separately. *See Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968). On June 1, 1990, Haloui was acquitted and ordered to remain in the jurisdiction as a material witness for the upcoming trial of Osseiran and Fisher. On October 10, 1990, the thirteenth day of Osseiran's and Fisher's trial, Osseiran pleaded guilty.[5] On October 16, 1991, the jury found Fisher guilty on Counts III and IV. Subsequently, Fisher dismissed his trial counsel and hired the attorney now representing him on appeal. Fisher's new counsel promptly filed a variety of motions attacking the verdict, each of which the district court denied. Upon resolution of these motions, Fisher was sentenced to two concurrent ten year prison terms.[6]

On June 3, 1991, Fisher, claiming ineffective assistance of trial counsel, filed a petition for habeas corpus with the district court pursuant to 28 U.S.C. § 2255.[7] As the basis therefor, Fisher complained of trial counsel's failure to raise seven separate issues. At the same time, Fisher filed a motion in this court seeking a stay of his previously-filed direct appeal. We granted the stay pending the district court's resolution of the § 2255 petition.

In a comprehensive memorandum and order dated July 16, 1992, the district court considered and rejected Fisher's ineffective assistance arguments on all grounds asserted. *See United States v. Osseiran*, 798 F.Supp. 861, 873–76 (D.Mass.1992). First, the court determined that the motions Fisher claimed should have been made would not have been granted. *Id.* at 873–76. Relying on this determination, the court then decided that Fisher had suffered no prejudice and that the representation afforded him by trial counsel was not constitutionally infirm. *Id.* at 876. However, the court concluded its memorandum and order by holding that it lacked the jurisdiction to deny formally Fisher's petition at that time. *Id.* Subsequently, we ordered the court to enter judgment on

---

**3.** The bag actually contained flour.

**4.** Fisher, in an increasingly agitated state, had been repeatedly calling Osseiran's jewelry store throughout the afternoon and asking to speak with Osseiran, who was under arrest. During the course of these telephone calls, Fisher both identified himself by name to the DEA agent who had remained in the store after the arrest and, when asked for his telephone number so that Osseiran could return the call, told the agent, "They know my number."

**5.** The government dismissed Counts I and II of the indictment against Osseiran and allowed him

to plead instead to an information charging the same offenses but for an unspecified quantity of drugs. The unspecified quantities in the amended indictment allowed the trial judge to depart downward below the ten year mandatory minimum. Osseiran was then sentenced to three years of imprisonment.

**6.** This sentence constituted a downward departure from the minimum 151 month term required by the United States Sentencing Guidelines.

**7.** The petition was filed before Judge Young, who also presided over Fisher's trial.

the petition. In response, the court issued an order denying it. This appeal followed.

On appeal, Fisher seeks relief on five grounds: (1) that evidence relating to a conspiracy to which he was not a party and with which he was not charged was improperly admitted against him; (2) that without evidence of the conspiracy referred to in Count II of the indictment, there was insufficient evidence to sustain his convictions; (3) that, in violation of his constitutional rights, he suffered a constructive amendment to and/or a prejudicial variance from the indictment; (4) that he was harmed by ineffective assistance of counsel; and (5) that his sentence was excessive in light of the sentence given to Osseiran. After determining the scope of the conspiracy, which is necessary for resolving Fisher's first three arguments, we discuss each in turn.

## II.

### DISCUSSION

#### A. Scope of the Conspiracy

■ As alluded to above, Fisher's first three arguments depend necessarily upon our acceptance of the following premise: that the trial court should not have found,[8] and correspondingly that the government should not have been allowed to argue, that the heroin and cocaine conspiracy alleged in Count II and the cocaine conspiracy alleged in Count IV actually were components of one large conspiracy.[9] Fisher's argument is not, however, based upon the evidence at trial. Instead, it proceeds from the fact that the grand jury charged only Osseiran and Haloui with the conspiracy alleged in Count II, while

charging only Fisher with the conspiracy alleged in Count IV. In Fisher's view, the fact that the indictment charged "different" conspiracies should have precluded the government from pursuing a "one large conspiracy" line of argument. Fisher's argument is without merit.

■ Simply put, the fact that an indictment charges conspiracy in separate counts does not mean that the conspiracies charged necessarily must be separate and distinct. We note that there is a complete absence of authority supporting the novel proposition Fisher asserts, and that pertinent case law suggests the very opposite. *Cf., e.g., United States v. David,* 940 F.2d 722, 734 (1st Cir. 1991) (acknowledging that separately charged conspiracies can constitute a single offense for double jeopardy purposes), *cert. denied,* —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992); *United States v. Hart,* 933 F.2d 80, 85–86 (1st Cir.1991) (same); *United States v. Gomez–Pabon,* 911 F.2d 847, 860 (1st Cir.1990) (same), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991). The reason for this is clear: the indictment is primarily used to provide notice of the charge or charges to the person or persons indicted; it is *not* a means of assessing proof. Thus, so long as it fairly serves its purpose,[10] we will not, employing 20/20 hindsight, view it as constricting the government in the manner Fisher suggests.

■ Having determined that the Count II and Count IV conspiracies were not, as a matter of law, separate and distinct, we now merely must decide whether it was plainly erroneous for the trial court to have concluded and subsequently allowed the government

---

8. The trial court implicitly made such a finding when, in accordance with the dictates of *United States v. Petrozziello,* 548 F.2d 20, 22–23 (1st Cir.1977), it ruled admissible as coconspirator statements made during the course and in furtherance of the conspiracy, *see* Fed.R.Evid. 801(d)(2)(E), all statements, including any relative to the cocaine and heroin conspiracy alleged in Count II, made by Osseiran. Later, in addressing Fisher's § 2255 petition, the court made this finding more explicit. *See Osseiran,* 798 F.Supp. at 872–73.

9. Because Fisher's trial counsel did not object to this line of argument at trial, we review only for

plain error. *See United States v. Brennan,* 994 F.2d 918, 925 n. 17 (1st Cir.1993). To establish plain error, Fisher must demonstrate that the error complained of is "so compelling that he virtually is assured of succeeding in his appeal, and that the error affected the fundamental fairness and basic integrity of the proceedings in the lower court." *Id.*

10. We note a defendant may always press arguments such as constructive amendment and prejudicial variance, discussed below, when, in his/her view, the indictment has not justly fulfilled its functions.

to argue that these counts alleged activities that were part of a single, larger conspiracy. We previously have identified five factors to be considered in determining whether two charged conspiracies actually constitute the same offense: (1) the time during which the activities occurred; (2) the persons involved; (3) the places involved; (4) whether the same evidence was used to prove the two conspiracies; and (5) whether the same statutory provision was involved in both conspiracies. *See Gomez–Pabon,* 911 F.2d at 860.[11]

Application of these five factors to the record before us reveals that the district court, far from committing plain error, made a supportable determination that there was a single conspiracy. First, the indictment charges that the activities referenced in Counts II and IV took place during the same basic time period—"[o]n or about December 29, 1989."[12] Moreover, the evidence reveals no discernible temporal gap between the activities related to Count II and activities related to Count IV. In our view, such facts tend to indicate that there was a single conspiracy which merely shifted direction when Osseiran determined that he would not be able to move the heroin he had previously agreed to purchase. *Cf. David,* 940 F.2d at 734 (distinguishing a change in direction in a single conspiracy from the inception of a conspiracy distinct from the original one). The strong identity between the persons, places, and evidence [13] involved in Counts II and IV only serves to reinforce this percep-

tion. Finally, we note that the two counts involved the same statutory provision.

Certainly, the argument that the conspiracies alleged in Counts II and IV are separate and distinct is not completely implausible. The plausibility of a theory in conflict with the lower court's ruling, however, plays no role in our review. Instead, we are limited to determining whether the trial court plainly erred in finding that the evidence revealed a single, overall conspiracy. *See supra* note 9. Patently, it did not. Accordingly, we affirm this finding.[14]

### B. Admission of Count II Evidence, Sufficiency, and Constructive Amendment/Prejudicial Variance

■ Having found no plain error in the determination that Counts II and IV referred to activities that were part of a single conspiracy, Fisher's first three arguments need not detain us long. Fisher, relying exclusively upon his "separate conspiracy" theory, first argues that the evidence concerning the conspiracy alleged in Count II, which the trial court admitted against Fisher, should have been excluded as unfairly prejudicial under Fed.R.Evid. 403.[15] We review the trial court's admission of this evidence only for an abuse of discretion. *See, e.g., United States v. Spinosa,* 982 F.2d 620, 629 (1st Cir.1992).

Here, contrary to Fisher's perfunctory assertions, the evidence at issue was directly

---

**11.** As noted previously, the *Gomez–Pabon* appeal presented us with the question of whether two separately charged conspiracies constituted a single offense for double jeopardy purposes. We see no reason, however, why these five factors should not also be used to determine whether there was a single conspiracy in the instant circumstances.

**12.** Of course, the setting forth, in approximate form, of this date in the indictment does not preclude the admission of evidence relating to events which occurred earlier. *See United States v. Bello–Perez,* 977 F.2d 664, 669 n. 4 (1st Cir. 1992).

**13.** In particular, the evidence concerning Osseiran's inability to move heroin and preference for cocaine is relevant to both the conclusion of the phase of the conspiracy alleged in Count II and the inception of the phase of the conspiracy alleged in Count IV.

**14.** To the extend that *United States v. Dunn,* 758 F.2d 30, 36 & n. 2 (st Cir.1985), may be read as raising the question of whether the government may charge part of an overall conspiracy and introduce evidence of the rest of the conspiracy *to prove the conspiracy charged,* it is clear that the question should be answered in the affirmative. *See United States v. O'Campo,* 973 F.2d 1015, 1023 n. 5 (1st Cir.1992).

**15.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

relevant to and highly probative of the overall conspiracy to which he was a party.[16] Moreover, we cannot discern any way in which it may have tended to engender unfair prejudice. Accordingly, we find that the district court did not abuse its discretion in admitting this evidence against Fisher.[17]

■■■ Fisher similarly argues that, absent evidence relating to the Count II conspiracy, there was insufficient evidence to sustain his convictions on Counts III and IV. Obviously, however, our rejection of the premise that the Count II conspiracy was separate and distinct from the Count IV conspiracy and our concomitant ruling that the Count II evidence was properly admitted against him is fatal to Fisher's sufficiency claims. Accordingly, we reject them.[18]

■■ Finally, Fisher contends that he suffered a constructive amendment to and/or prejudicial variance from the indictment. Once again, in making these arguments,

Fisher depends upon his theory that the Count II conspiracy necessarily was separate and distinct from that charged in Count IV. Given our rejection of this theory and affirmance of the trial court's finding of one overall conspiracy, however, it is readily apparent that no constructive amendment or variance took place.

■■■ A constructive amendment " 'occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them.' " *Dunn*, 758 F.2d at 35 (quoting *Gaither v. United States*, 413 F.2d 1061, 1071–72 (D.C.Cir.1969)). A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment. *See United States v. Tormos–Vega*, 959 F.2d 1103, 1115 (1st Cir.), *cert. denied*, ―― U.S. ―― – ――, 113 S.Ct. 191–92, 121 L.Ed.2d 135 (1992); *see also*

---

**16.** In so ruling, we are mindful that the government "need not recite all of its evidence in the indictment, nor is it limited at trial to the overt acts listed in the indictment." *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. June 17, 1993).

**17.** In arguing that the Count II evidence improperly was admitted against him, Fisher also contends that Counts I and II were improperly joined with Counts III and IV. Once again, trial counsel's failure to raise this issue below limits our review to one for plain error. *Brennan*, 994 F.2d 918, 925 n. 17.

Given our endorsement of the trial court's finding that the activities alleged in the indictment were part of a single, overall conspiracy, and given the absence of any other constitutional problems, it is clear that all counts were properly joined and that no plain error was committed. Accordingly, Fisher's joinder argument also must be rejected.

**18.** To the extent that Fisher is arguing that, even with the admission of the Count II evidence, there was insufficient evidence to sustain his convictions, his arguments are meritless. In order to convict Fisher of attempting to possess with intent to distribute cocaine, the government was required to prove, by direct or circumstantial evidence and beyond a reasonable doubt, that Fisher intended to commit the aforementioned substantive offense and that he took a substantial step toward its commission. *See, e.g., United States v. Figueroa*, 976 F.2d 1446, 1459 (1st Cir.1992), *cert. denied*, ―― U.S. ――, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993). In order to convict him of conspiring to possess with intent

to distribute cocaine, the government was required to prove, by direct or circumstantial evidence and beyond a reasonable doubt, that Fisher entered into an agreement with another to commit the aforementioned substantive offense. *See, e.g., Innamorati*, 996 F.2d at 471.

Reviewing the evidence in a light most favorable to the government and resolving all credibility issues in its favor, *see Brennan*, 994 F.2d at 920 (setting forth standard of review governing appellate challenges to the sufficiency of the evidence), we find that there was ample evidence to support Fisher's convictions. In our view, Fisher's (1) acceptance of the heroin sample in advance of the scheduled heroin and cocaine delivery; (2) presence at Absolute Diamonds on the morning of the scheduled cocaine delivery; (3) repeated hectic phone calls to Osseiran at Absolute Diamonds throughout that same afternoon; and (4) knowledge that Islam was a "cop" and refusal to take the drugs for that reason, when combined with the amount of the drugs to be delivered and Malik's testimony that Osseiran had stated that the heroin sample would be delivered to "Mike" in East Boston, constitute a sufficient circumstantial evidentiary basis for the jury to have concluded that Fisher both intended to commit the possession offense charged and had entered into an agreement with Osseiran to commit that same offense. Moreover, we believe that Fisher's acceptance of the heroin sample was a substantial step towards the commission of the offense. Accordingly, having found record evidence supporting each of the elements of the offenses of conviction, we decline to disturb the jury's verdict.

*Hunter v. State of New Mexico*, 916 F.2d 595, 598 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1693, 114 L.Ed.2d 87 (1991). A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction. *Dunn,* 758 F.2d at 35. Variance is grounds for reversal only if it affected the defendant's "substantial rights"—i.e., the rights to "have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense." *Tormos–Vega,* 959 F.2d at 1115. Variance also protects against "prejudicial spillover" so that when a defendant has multiple codefendants, "proof that one defendant was involved in one conspiracy does not lead the jury to believe that another defendant was involved in a separate conspiracy." *Id.*

Here, Fisher was charged, convicted, and sentenced for attempting to possess with intent to distribute cocaine and conspiring to possess with intent to distribute cocaine. The evidence admitted against him pertained directly to these, and to no other, charges. The fact that the government proved aspects of the conspiracy beyond those recited in the indictment against Fisher—i.e., those relating to Count II—simply does not constitute a variance. *See Innamorati,* 996 F.2d at 477–478 (finding no variance when the government introduced at trial evidence and overt acts relating to the charged conspiracy outside those alleged in the indictment). Accordingly, we reject Fisher's constructive amendment and prejudicial variance arguments.[19]

### C. Ineffective Assistance

 Fisher's fourth argument is that he was victimized by ineffective assistance of counsel at trial. In support of this argument, Fisher advances three "failures" of trial counsel: (1) trial counsel's failure to move for severance on the basis of prejudicial joinder; (2) trial counsel's failure to move for a mistrial or, at least, to strike the heroin evidence after Osseiran pleaded guilty; and (3) trial counsel's failure to object when the prosecutor made reference to the heroin evidence in her closing argument. Yet again, our determination that the trial court's single conspiracy finding was supportable renders Fisher's argument unavailing.

 In order to establish a Sixth Amendment violation for ineffective assistance of counsel, a defendant must demonstrate (1) that counsel fell below the applicable standard for performance, defined by what the lawyer knew, or should have known, at the time of his/her tactical choices; and (2) that prejudice resulted. *See United States v. Natanel,* 938 F.2d 302, 309 (1st Cir.1991) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). Here, as the district court points out in its thorough and well-reasoned memorandum responding to Fisher's § 2255 petition, because there was a single, overall conspiracy, each of the aforementioned motions/objections would have been denied/overruled. *See Osseiran,* 798 F.Supp. at 873–76.[20] Accordingly, Fisher suffered no prejudice from trial counsel's failure to press these matters. And, without a showing of prejudice, Fisher's ineffective assistance claim cannot succeed.

### D. Sentence Disparities

 Fisher's fifth and final argument, that his sentence was excessive in light of the

---

19. We note that the issue of variance most often comes up when the indictment charges one overall conspiracy but the trial evidence reveals separate conspiracies and that a particular defendant is a member of only some of those conspiracies. *See generally United States v. Glenn,* 828 F.2d 855, 857–58 (1st Cir.1987). In such instances, of course, there is the possibility that a defendant can be prejudiced by being convicted of a crime other than the one with which s/he was charged. *Id.*

Here, however, Fisher was convicted of and sentenced for a conspiracy *smaller* in scope and breadth than that for which he may have, in fact,

been culpable. Given this fact, his protestations of prejudice are difficult to fathom.

20. As noted earlier, *see supra* note 17, the fact that all activities referenced in the indictment were part of a single conspiracy requires a finding that the counts were properly joined. And obviously, as stated above, the fact that the heroin evidence was part of the same conspiracy for which Fisher was convicted means that the evidence was both properly admitted against him and, *a priori,* properly referred to by the prosecutor in her closing argument.

amount of time given to Osseiran, does not require extended discussion. In sentencing Fisher, the trial court departed downward from the applicable sentencing guidelines range. We have repeatedly made clear that we "lack jurisdiction to review the 'extent of a downward departure merely because the defendant is dissatisfied with the quantification of the court's generosity.'" *United States v. Gregorio*, 956 F.2d 341, 345 n. 5 (1st Cir.1992) (quoting *United States v. Pighetti*, 898 F.2d 3, 4 (1st Cir.1990)) (brackets and ellipsis omitted). Accordingly, we do not have jurisdiction to entertain Fisher's contention that he "was entitled to a greater downward departure than he received[.]"

## III.

### CONCLUSION

Having rejected each of the arguments made on appeal by Fisher, we affirm his convictions and sentence.

*Affirmed.*